FILED

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

99 OCT -6 AM 8: 21

U.S. DISTRICT COURT
N.D. OF ALABAMA

PEMCO AEROPLEX, INC.,                    )
                                          )
    Plaintiff,                           )
                                          )
vs.                                       )
                                          )
WILLIAM S. COHEN, et al,                  )       No. CV 98-J-2584-S
                                          )
    Defendants,                          )       **ENTERED**
                                          )                    as l
MCDONNELL DOUGLAS CORP.,                  )       OCT   6 1999
                                          )
    Defendant-Intervenor.                )

## MEMORANDUM OPINION

This cause comes before this court on the following: Defendants' motion for summary

judgment (doc. 88), in response to which Plaintiff has filed its opposition, and Defendants' reply;

Plaintiff's motion for summary judgment (doc. 85), in response to which Defendants (doc. 98)

and Defendant-Intervenor (doc. 96) have filed opposition to Plaintiff's reply (doc. 105, 106);

Defendant-Intervenor's motion for summary judgment (doc. 83), to which Plaintiff filed its

opposition and Defendant-Intervenor's reply.   This court has considered said motions, briefs

submitted in support of and in opposition to said motions, and evidentiary materials filed in

support of and in opposition to said motions.

### I. Procedural History

Pursuant to the Bid Protest Regulations as set out in 4 C.F.R. pt. 21, Pemco Aeroplex,

Inc. ("Pemco") filed a protest with the General Accounting Office ("GAO"). At issue were the

126

terms of the solicitation issued by the United States Air Force for the outsourcing of the workload being performed at the Sacramento Air Logistics Center ("SM-ALC"). The solicitation bundled the KC-135, A-10, and commodity workloads performed at the SM-ALC into one solicitation. In its protest, Pemco alleged the terms of the solicitation wrongly denied Pemco the chance to participate individually in a bid for the KC-135 workload. AR 00040. The protest was filed two days before the contract was set to be awarded. *See* AR 00040-00147.

Pemco argued the denial of the opportunity to bid unduly restricted competition in violation of the Competition in Contracting Act ("CICA"), 10 U.S.C. § 2305, *et seq.. See* 10 U.S.C. § 2305, *et seq.* Additionally, Pemco asserted the issuance of a single solicitation for the performance of multiple depot-level maintenance and repair workloads violated 10 U.S.C. § 2469a ("§ 2469a"). After an investigation and hearing, the GAO recommended the contract award be suspended, the workloads unbundled, and the requirements re-solicited. GAO Decision, Report # B-28037 at 11 (September 25, 1998).

Upon deliberate review of the GAO decision, the Air Force determined the solicitation did in fact conform with the CICA and § 2469a. Therefore, the Air Force declined to follow the GAO recommendation. On October 9, 1998, the Air Force notified Congress of its intent to proceed with the contract, awarding the contract that same day. AR 05675-05678. The Air Force based its decision on readiness concerns as well as the amount of savings generated by the solicitation. AR 05679.

Shortly thereafter, on October 13, 1998, Pemco filed a complaint with this court seeking declaratory and injunctive relief. (Doc. 1). In their complaint, Pemco again alleges violations of both the CICA and § 2469a. *Id.* Pemco immediately requested a preliminary injunction. The

2

preliminary injunction was denied after a hearing on the merits on November 20, 1998. (Doc. 32.) Upon denial of their request for preliminary injunctive relief, Pemco filed a motion to dismiss the complaint without prejudice in a attempt to transfer the case to the Federal Claims Court. (Doc. 37.) Said motion was denied. (Doc. 42).

The court has considered the record and the briefs of the parties and for the reasons set forth herein, plaintiff Pemco's motion for summary judgment is **DENIED**. Motions for summary judgment filed on behalf of Defendants William Cohen, et al and Defendant-Intervenor McDonnell Douglas, Corp. are herein **GRANTED.**

## II. Undisputed Material Facts

Pursuant to the Defense Base Closure and Realignment ("BRAC") Act of 1990, the BRAC Commission recommended the closure of McClellan Air Force Base in Sacramento, California. Defense Base Closure and Realignment Commission 1995 Report to President, I-85; AR 04928, Tab 69. This decision was reported to the President July 1, 1995, setting the date for closure in 2001. *Id.; see also* AR 03655. Located on base at McClellan is the Sacramento Air Logistics Center ("SM-ALC"), responsible for the performance of various vital maintenance procedures. Such maintenance procedures include programmed and unscheduled depot maintenance on the KC-135 and A-10 aircraft as well as the repair of a myriad of aircraft and aircraft-related commodities (hydraulics, flight control components, aircraft flight instruments, airborne generators and ground power). Programmed depot maintenance ("PDM") is a process by which an airplane is essentially disassembled, the worn parts repaired or replaced, and the aircraft then reassembled. Due to the extensive nature of this maintenance, PDM contracts are

3

highly lucrative.

The KC-135 is a large airlift and troop transport category aircraft capable of transporting pelletized cargo, supplies, and personnel. AR 00042, Pemco Protest to GAO. Significantly, the aircraft is equipped with a telescoping boom and nozzle assembly which enables the KC-135 to refuel most of NATO's military aircraft in-flight. AR 00042. The KC-135 "form[s] the backbone of the Air Force tanker fleet . . . as well as the Navy, Marines, and allied forces." AR 04400, Declaration of General Walter Kross. Including SM-ALC, there are only three depots, capable of maintaining the KC-135.[1]   Proper maintenance and upkeep of a KC-135 is essential as the aircraft has been out of production for quite some time, the newest of the fleet over thirty years old. Testimony of Mr. James C. Barrone, Preliminary Injunction Hearing, November 12 - 13, 1998, ("Barrone Testimony") at 148.

The A-10 is a tactical, combat aircraft used to provide support to ground forces. AR 00022. The SM-ALC was the sole source of maintenance for this aircraft.

Similarly, SM-ALC was the sole or primary source of maintenance for what has been referred to as the "commodities" of the workload at issue in this litigation. AR 00023, Barrone Testimony at 130. The "commodities" include the maintenance of more than 700 hydraulic based items, more than 500 aircraft instruments/electronics, and more than 500 electrical accessories. AR 00023. The commodities make up an integral part of the aircraft. If any aspect

---

[1] The other depots capable of PDM are Tinker AFB in Oklahoma ("Tinker") and Pemco Aeroplex ("Pemco") in Birmingham, Alabama.

of an aircraft's hydraulic[2], instrument/electronics[3] or electrical accessory[4] systems fail, the aircraft is grounded.   The grounding of an aircraft directly effects the Air Force's Mission Capable Rate (MCR), a figure used in determining the readiness of the Air Force.[5]   AR 04401. Therefore, when failure occurs, the Air Force must have a guaranteed source of repair for those items.  AR 05111.

The closing of McClellan required all workloads, including the work performed by SM-ALC, be outsourced to private and public competitors.  The BRAC Commission had recommended outsourcing be achieved by transferring specific workloads to certain Department of Defense ("DoD") depots[6] and competing the remaining workloads.  Pursuant to the BRAC Commission's recommendation, the workloads comprised of the KC-135, A-10 and commodity work performed at SM-ALC, were among the workloads to be competed.   Because this workload was valued at more than three million dollars, the Air Force was required to implement a competitive bidding procedure. *See* 10 U.S.C. § 2469 (1996).

Within months of receiving notice of the closure, SM-ALC began studying possible

---

[2] The hydraulic component of this workload includes actuators, brakes, cylinders, gear boxes, manifolds, motors, pumps, servos and valves.  AR 04147.

[3] This component includes electro/mechanical/digital displays on the aircraft as well as airborne computer flight control systems.  AR 03543.

[4] Items falling under the electrical accessory category include: generators, screwjacks/actuators, AC/DC motors, diesel and gas turbine engines as well as electrical panels and components.

[5] The Air Force's MCR was at 74.5%, the lowest since the mid-1980's, before the closing of McClellan and the accompanying transition period.  AR 00034.

[6] Specifically, the army depot in Tobyhanna, PA.

alternatives for achieving the most competitive bids for the workload. Officials at SM-ALC held various strategy meetings with Air Force personnel and private industry representatives. *See* AR 03731-03846, 04140-04152, 04078-04086, 04252-04253. At the start, the Air Force opined the solicitation should be broken into seven individual workloads. The Air Force believed the workload fell into seven logical product groupings and therefore divided each grouping into a separate Request For Proposal ("RFP"). The seven groupings included: (1) software, (2) aircraft, (3) electronics/instruments, (4) electrical accessories, (5) hydraulics, (6) manufacturing and (7) logistics management. AR 00026.

Initial discussion with private industry operated under the presumption each workload would have its own RFP. However, after extensive discussion with competitors and several Requests for Information ("RFI")[7] indicating a lack of interest in the individual groupings, the Air Force soon determined the proposed framework would actually decrease competition. AR 04153-04232; 04117-04134; *see also* AR 004233 (Air Force decision that private industry could not survive at time of fluctuation); AR 03604. Specifically many private competitors, including five original equipment manufacturers ("OEM"), informed the Air Force they would not compete for certain commodities. *See* AR 00028, 04117-04134, 04142-04152. These competitors were concerned with the diversity of the workload requirements.

The proposed outsourcing solicitation was requirements based, with the commodities as a whole extremely volatile. Additionally, demand for the repair within a commodity varies yearly,

---

[7] A request for information is a request given from the government to industry asking them to respond to various questions in an effort to obtain useful information on how to build the solicitation and whether there is interest in the work. Barrone Testimony at 179. In contrast, the Request for Proposals is a request from the government for proposals on the solicitation itself.

affording the Air Force a mere estimation of the work to be done within each commodity.[8] This difficulty in assessing repair needs for a contract does not change the fact the commodity repair provider must have the necessary skill and equipment to perform the contract on demand. These factors would make it difficult for the offeror to maintain profitability during periods of great fluctuation in the workload.

The Air Force's inability to provide a more exact estimation as to the annual value of a commodities contract discouraged bidding for individual commodities. AR 00037. Therefore, it was determined the commodities would have to be bundled together. Despite the fact the bundling now offered a broader and more consistent base of work to be performed under a contract, interest in the commodities, in whole or in part, was low. In order to provide additional incentive to potential bidders, the Air Force decided to include the more lucrative PDM work with the commodities contract.

On July 26, 1996, a special meeting of the Defense Depot Maintenance Council ("DDMC") was called by the Air Force to discuss a possible revision to the acquisition strategy. AR 03966. It was decided that the Air Force would no longer seek individual bids for each workload. Rather, the solicitation would "bundle" each individual workload into one solicitation. *See* AR 03967-03971. The Air Force believed that larger contractual packages would foster cost reduction strategies for the private industry while maximizing competition and maintaining an effective and efficient transfer of the workload. *Id.* After the DDMC decision, the Air Force spent sixteen months researching and reviewing their decision to issue a single

---

[8]For instance, the Air Force estimated that 248 F-16 generators would require repair in 1997. However, 755 generators were received for repair. AR 00023, AR 00004 at FN4.

7

solicitation for the bundled workload.

In November of 1996, four months after the decision to bundle, the Air Force awarded a study contract to two private bidders[9] for the sole purpose of researching the most effective and efficient way to orchestrate the workload transition. *See* AR 03629-03945. This contract gave potential bidders the opportunity to access and view the operations at SM-ALC "in order to become familiar with the workloads, explore approaches for process improvements, make recommendations for the Maintenance Contract solicitation and be able to provide an innovative, low cost, low risk proposal for accomplishing the maintenance workload." Solicitation F04505-96-R-0066; AR 03656. The study was completed by AAI, Inc. and Boeing. At the time of the study contracts, Pemco was teamed with Boeing.[10]

On March 18, 1997, the Air Force again issued a RFI, the second dealing with the consolidated workload. AR 03374-03398. At this time, the Air Force directly posed the question as to whether the decision to bundle was an appropriate decision. While criticism of the decision to bundle did exist, none of the contractors presented a more viable solution to the transfer of this immense workload. *See, e.g.* AR 01186-01465; Ogden's Revised Transition Integration Plan. In September, AAI, Ogden, and Boeing released Acquisition Plans, final revisions of which were issued in December of 1997. These Acquisition Plans addressed the methodology SM-ALC would employ to effectuate an efficient transition with as minimal

---

[9] Ogden-Hill AFB participated in the study contract as the public offeror as well. There is evidence Ogden objected to the bundling terms but proceeded with the selection and solicitation process regardless. *See* Pemco EM at 19885, AR 00804, 01187.

[10] At some time before the RFPs for the bundled workload itself, the partnership between Pemco and Boeing dissolved.

disruption as possible to the workload.

Based on the foregoing information, the Department of Defense issued its Secretarial Determination in accordance with 10 U.S.C. § 2469a on December 19, 1997. AR 01029-01044. After exhaustive research into base closure transitions,[11] the Air Force decided the decision to bundle the workloads was as logical and economical as individual solicitations for each workload. Specifically, it was determined this approach provided "optimum competitive leverage to reduce cost and risk across the workloads." AR 00951. This leverage was the result of a more stable business base and opportunities on the part of the private industries to team with other private competitors to reduce the cost of performing the contract. *Id.*

After the Secretarial Determination was presented to Congress and the decision to bundle now formalized, Pemco filed a proposal to be teamed with Ogden. AR 04494-04607. In February, Ogden requested Pemco's best overall bottom line. McDonnell Douglas Evidentiary Submission ("MDC Supp.") 01188. Two days later, on February 27, 1998, Pemco responded by refusing to provide the information requested. MDC Supp. 01158. In that same correspondence, Pemco stated they were "committed to fully participating and cooperating with [Ogden's] program management team" and would share the data requested only *after* Pemco was selected as Ogden's teaming partner. *Id.* Evidence shows Pemco maintained contact and was still interested in teaming with Ogden through March 16, 1998. *See* MDC Supp. Tabs 5,7. However, Pemco never provided the information requested by Ogden.

---

[11] In addition to discussions with private industry leaders, SM-ALC and various other Air Force officials visited several other bases, including Anniston and Newark, to investigate those base closures and view first hand the difficulties in the implementation of this massive undertaking.

On March 20, 1998, Ogden chose Boeing to be its teaming partner.[12]  AR 04911-04913.

Under the teaming agreement, Boeing would perform the maintenance on the KC-135.  At this

time, Pemco could have filed an RFP with another teaming partner.  It is not clear when or why

they chose not to join with another team to bid.  Through the course of this litigation, Pemco has

articulated several different reasons for their decision.  Initially, Mr. Hauck, the President of

Pemco, decided Pemco was not interested in the SM-ALC workload.  *See* Deposition of

Raymond J. Hauck at 145.  Next, Pemco stated they chose not to bid with a team because they

did not want to work as a subcontractor.  Deposition of Raymond J. Hauck at 107.  Finally,

Pemco contended they dropped out of the competition because of their opposition to the

bundling.  The court finds all three of the reasons given illusory and contrary to the evidence.

First, Pemco's conscientious objection to bundling seems to have arisen *after* they lost

the Ogden team bid.  Pemco now comes forward to argue bundling was illegal because the

purpose of the bundling was to privatize in place.  Initially, it was the hope of President Clinton

that the workloads to be competed could be "privatized in place" ("PIP").  *See* Plaintiff's

Supplement to the Administrative Record ("AR Supp."), Tab 99; McDonnell Douglas' Brief in

Opposition to Plaintiff's Motion for Summary Judgment, 5.  PIP would enable the Air Force to

achieve the privatization required pursuant to the BRAC determination as well as secure the jobs

---

[12] Five other companies proposed teaming with Ogden.  They were: Dyncorp, Global
Marketing Group, Korean Air Lines, Lóckheed Martin ALC, and Pemco.  All of the offers were
for the KC-135 workload.  The evidence is undisputed that Pemco's proposal was considered by
Ogden to be competitive with Boeing's proposal.  However, Pemco was not chosen because
Boeing's submitted price was 28% lower than Pemco's and because Defense Contract
Management Command (DCMC) recommended Pemco not receive an award based on Pemco's
financial instability.  *See* 04608-04671, *see also* MDC Evid. Supp. 1661.

of the civilian personnel in Sacramento by having private industry take over the base. Pemco
Motion for Summary Judgment ("Pemco MSJ") at 2, Pemco Evidentiary Supp. ("Pemco Supp.")
at 19802-19807. As such, much of the initial discussion regarding the workload assumed the
work would be performed on site at McClellan but under private ownership.[13]

However, PIP quickly became a political issue. *See* Pemco Supp. at 19886 (editorial
from Sen. James Inhofe regarding Clinton's base closure policy in light of PIP as dishonest).
After PIP was criticized as contrary to the purpose of the BRAC Act, Congress enacted 10
U.S.C. § 2469a, which provides for bundling of solicitations only upon a finding by the Secretary
of Defense that bundling is as logical and economical as individual solicitations. *See* 10 U.S.C. §
2469a (1997), *see also* 1997 U.S. Code Cong. and Adm. News 2251, 2503. Additionally, §
2469a prohibits giving preference to a specific location for the work to be performed. 10 U.S.C.
§§ 2469a(d)(4)-(5).

Before the enactment of § 2469a, however, the idea of PIP at McClellan was abandoned.
It is uncontroverted that PIP, as well as its consideration in proposed solicitations for the SM-
ALC workload, was abandoned by the Air Force[14] in the Summer of 1996. *See* Barrone
Testimony at 180. Additionally, the solicitation itself makes no mention of a specific location
for the work to be performed, the central theme of PIP. Therefore, Pemco's assertion it did not

---

[13]It should be noted that at the time discussions regarding solicitations and PIP were
underway, no law prevented either PIP or bundling so long as it was necessary to achieve the
needs of the agency. *See* 10 U.S.C. § 2305(a)(1)(B)(ii).

[14] MDC Opp. at 6 (*citing* Public-Private Competitions, Review of Air Force Depot
Solicitation, GAO-98-48 at 5 (May 1998) ("nothing in the solicitation [] designates a particular
location . . . nor do any of the solicitation evaluation criteria evidence a bias toward any
particular location.")).

submit a proposal because they believed the decision to bundle was motivated by PIP and therefore illegal, lacks merit.

Second, there is substantial evidence within Pemco's own business records indicating it intended to continue on with the bidding process. In January of 1997, the President of Precision Standard, Inc., Pemco's parent company called Ogden personally to inform them Pemco's partnership with Boeing had dissolved but Pemco's interest in bidding on the KC-135 remained. AR 04499. In that conversation, Mr. Hauck expressed a desire to bid with Ogden on the workload. *Id.* Most importantly, on May 19, 1998 PSI filed their Form 10-Q Quarterly Report with the Securities and Exchange Commission. In this report the company stated "Pemco intends to pursue this workload through teaming or subcontracting agreements." MDC Evidentiary Submissions at tab 11.[15] This was one month before the RFP for the SM-ALC solicitation was due.

Additionally, there exists evidence Pemco's decision not to bid on the bundled workload was not the result of bundling objections but rather poor business judgment. *See* Hauck deposition at 145 (considering and rejecting the opportunity to team with another partner and bid on his own). Mr. Hauck asserted the RFP Pemco did submit to Ogden was not the product of extensive effort on the part of Pemco. Hauck Deposition at 84. Specifically, Mr. Hauck stated the price quoted to Ogden for the work to be performed by Pemco would have been lower and

---

[15] This was the second submission by Pemco to the SEC indicating an intent to team bid for the SM-ALC solicitation. The first was filed April 15, 1998, one month after Boeing was selected for teaming with Odgen and three months before Pemco filed its protest with the GAO. *See* MDC at tab11.

more competitive if Pemco spent more time on their proposal.[16]  *Id.*  However, at the preliminary injunction hearing before this court, Mr. Hauck could not state with certainty which aspect of the bid pricing would be lower or how a lower quote could be achieved.[17]

Two days before the RFPs were due, Pemco filed a protest with the GAO.  In its protest, Pemco alleged the terms of the solicitation wrongly denied Pemco the chance to participate individually in a bid for the KC-135 workload. AR 00040.  Pemco argued the requirement that the workloads be bundled into one solicitation was an impermissible restriction of competition and therefore violative of the CICA. AR 00041.  In addition, Pemco alleged the bundling itself was violative of both the letter and the spirit of § 2469a. AR 00041.

The GAO issued a decision on September 29, 1998.  GAO Report B -280397 (September 25, 1998).  In reviewing all of the evidence, the Comptroller General sustained Pemco's protest. In the decision, the Comptroller General specifically held the Air Force had indeed complied with 10 U.S.C. § 2469a.  However, it was the opinion of the GAO that the Air Force fell short of the burden articulated in the CICA, not having shown the decision to bundle was necessary to meet the needs of the agency.  *Id.*  In light of this finding, the GAO recommended the solicitation be withdrawn, the workloads be unbundled and then individually  re-solicited.

Despite the fact the GAO sustained Pemco's protest, the Air Force decided to proceed

---

[16] The cost submitted by Pemco to Ogden was 28%, or $370,924,548.00, more than McDonnell Douglas' cost.

[17] In fact, the RFP submitted to Ogden by Pemco stated its "46 years of collective experience and knowledge in processing both the KC-135 and C-130 through PDM and modification ensures accuracy of cost and pricing to such a degree that performance risk is virtually eliminated. AR 04534; MDC Brief in Support of Motion for Summary Judgment, 13.

with the award to Ogden Air Logistics Center. AR 05624. The Air Force based its decision on the effect the GAO recommendation would have on their readiness posture. Id. Specifically, it was determined a re-solicitation would delay the award of the contract for at least one year, adversely affecting the Air Force's ability to close McClellan within the time frame required by law. *Id.* Therefore, on October 9, 1998, the Air Force issued a news release awarding the contract for the bundled SM-ALC workload to Ogden-Hill AFB and its teaming partner, Boeing. Pemco Supp. 19988. That same day, the Department of Defense notified Congress of its intent to proceed with the contract despite the GAO recommendation. AR 05675.

### III. Standards of Review

#### A. Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since the complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp.* 477 U.S. at 322-23. The party asking for summary judgment always bears the

initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrates the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, Fed. R. Civ. P. 56(e). In meeting this burden the nonmoving party "must do more than simply show that there is a metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 587, *see also Anderson, v. Liberty Lobby,* 477 U.S. 242, 249 (1986). The non-movant must "demonstrate that there is indeed a material issue of fact precluding summary judgment." *Clark v. Clark & Coats, Inc.*, 929 F.2d 604, 608 (11th Cir.1991).

On motions for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The substantive law will identify which facts are material and which are irrelevant. *Anderson,* 477 U.S. at 248. All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249. The basic issue before the court on a motion for summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or

15

whether it is so one-sided that one party must prevail as a matter of law." *Holcombe v. Alabama Dry Dock & Shipbuilding, 1998 WL 758012 (S.D. Ala.);* citing *Anderson*, 477 U.S. at 251-252.

## B. Administrative Procedure Act

Review of a procurement decision is quite limited. The Tucker Act, 28 U.S.C. § 1491(b), grants jurisdiction to district courts in order to render judgment on actions concerning solicitations by Federal agencies in accordance with the standards set forth in 5 U.S.C § 706, the Administrative Procedure Act. 28 U.S.C. § 1491(b)(1) (1996). In so doing, the courts must afford due regard to issues of national defense and national security. 28 U.S.C. § 1491(b)(4).

Under the Administrative Procedure Act, agency action must be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," or if it fails to meet statutory, procedural, or constitutional requirements. 5 U.S.C. §§ 706(2)(A)--(D) (1988).[18] This standard of review is "highly deferential," reflecting the respect given to agency interpretation and application of procurement regulations. *Latecoere International, Inc. v. United States Department of the Navy*, 19 F. 3d 1342, 1355 (11th Cir. 1994) (*citing Kinnett Dairies, Inc. v. Farrow*, 580 F. 2d 1260, 1272 (5th Cir. 1978)); *see also Shoals American Industries., Inc. v. United States*, 877 F.2d 883 (11th Cir. 1989); *Lockheed Missiles & Space Co. v. Bentsen*, 4 F.3d 955, 958-59 (Fed. Cir. 1993). Accordingly, there is a presumption of validity

---

[18] Pemco contends CICA was intended to divest agencies of discretion, imposing an affirmative obligation to limit the use of restrictive specifications in procurements. *See* Pemco MSJ at 1. Accordingly, Pemco argues the violation of law standard of review is applicable. *Id.* However, it is well settled the standard under which agency procurement decisions are to be reviewed is "arbitrary and capricious." *See Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823 (1971), *Cincom Systems v. United States*, 37 Fed. Cl. 663, 672 (1997), *Latecoere*, at 1355, *Shoals*, at 887 .

with an agency's action. *Hussion v. Madigan,* 950 F.2d 1546, 1553 (11th Cir. 1992).  Such a presumption is heightened when, as here, the interpretation is of a new statute by its implementing agency. *See Power Reactor Development Co. v. International Union of Electrical, Radio, and Machine Workers, AFL-CIO,* 367 U.S. 396, 408, 81 S. Ct. 1529, 1535 (1961); *see also United States v. Zucca,* 351 U.S. 91, 96, 76 S. Ct. 671, 674 (1956); *Norwegian Nitrogen Products Co. v. United States,* 288 U.S. 294, 315, 53 S. Ct. 350, 358 (1933).

Despite the court's deference to the agency, the "arbitrary and capricious" standard requires that the court "immerse" itself in the evidence in the record, *Ethyl Corp. v. Environmental Protection Agency,* 541 F.2d 1, 36 (D.C. Cir. 1975) and conduct a "thorough, probing, and in-depth review." *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. at 415, 91 S.Ct. at 823 (1971).  To be upheld, the agency must have "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of United States v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 2866-67, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. U.S.,* 371 U.S. 156, 168, 83 S.Ct. 239, 245-46, 9 L.Ed.2d 207 (1962)).  The court will find an agency action to be arbitrary where  the agency relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that was counter to the evidence before the agency, or is so implausible that it would not be ascribed to a difference in view or the product of agency expertise. *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867.  Additionally, the reviewing court may not supplant rationale in an effort to uphold an agency decision. It is a fundamental proposition of law that this Court "may not supply a reasoned basis for the agency's action that

the agency itself has not given." *United States v. O'Hagan,* 521 U.S. 642, 687, 117 S. Ct. 2199, 2224 (1997) (quoting *State Farm,* 463 U.S. at 43, 103 S.Ct. at 2867)).

Thus, where the agency has avoided these pitfalls, its decision is to be accorded deference. The court is not to act as a "superagency," substituting its judgment for that of the agency expert decisionmaker, but must affirm decisions it may disagree with as long as the agency has acted within the law. *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983); *Bowman Transp. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 441-42. (1974); *see also Latecoere,* 19 F. 3d at 1356 (*citing M. Steinhal & Co. v. Seamans,* 455 F. 2d 1289, 1301-03 (D.C. Cir. 1971).

Finally, a prior determination regarding an agency's decision by the General Accounting Office is not dispositive. Decisions by the GAO are advisory in nature, binding neither the agency nor this court. *Cubic Applications, Inc. v. United States,* 37 Fed. Cl. 339, 341 (Fed Cir. 1997) (citing *Honeywell, Inc. v. United States,*[19] 870 Fed. Cl. 644, 649 (Fed. Cir. 1989). Rather, GAO determinations serve, at the court's discretion, as general guidance to the extent it is reasonable and persuasive in light of the administrative record. *Cubic Applications,* at 342 (citing *Bellevue Bus Service, Inc. v. United States,* 15 Cl. Ct. 131, 134 n. 3 (1988)). In accordance with this standard, the disappointed bidder must show by clear and convincing evidence either (1) the procurement official's decisions on matters committed primarily to his

---

[19] Pemco cites to both *Honeywell* and *Shoals* in support of their position it is the GAO's decision, not the Air Force's, for which the court must find a rational basis. There, the Eleventh Circuit examined the GAO decision for rational basis. However, in both cases, the agency *changed* their own interpretation and acted in accordance with the GAO decision. In such a case, the GAO's decision is tantamount to the agency's decision and is therefore subject to review by the courts.

own discretion had no rational basis or (2) the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *ECDC Environmental, L.C. v. United States,* 40 Fed. Cl. 236, 241 (Fed. Cir. 1998)*; see also Day & Zimmerman Services v. United States,* 38 Fed. Cl. 591 (Fed. Cir. 1997); *Kinnett Dairies, Inc.,* 580 F. 2d 1260, 1271 (5th Cir. 1978).

## IV. Analysis

The crux of the issue presented is whether 10 U.S.C. § 2469a is intended to replace or strengthen the Competition in Contracting Act ("CICA"). In light of the plain meaning of both statutes, as well as evidence of legislative intent, this court holds the enactment of 10 U.S.C. § 2469a was intended to replace CICA in the limited capacity of base closures selected under BRAC.

### A. 10 U.S.C. § 2469a

Plaintiff first claims the Air Force complied with neither the letter nor the spirit of § 2469a(e). Pemco Complaint ¶ 73-77. To determine the validity of this argument, the Court must construe the language of 10 U.S.C. § 2469a so to give effect to the intent of Congress. *See United States v. American Trucking Ass'n Inc.,* 310 U.S. 534, 542, 60 S.Ct. 1059, 1063 (1940).

There are several canons of statutory construction that guide the interpretation of § 2469a. The first, and most important, step in statutory construction is to examine the language of the provision itself. *Korman v. HBC Florida,* 182 F.3d 1291, 1295 (11th Cir.1999) (*citing United States v. Steele,* 147 F.3d 1316, 1318 (11th Cir.1998) (en banc)); *see also Watt v. Alaska,* 451

19

U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981).  Looking at § 2469a in its entirety,

*United States v. McLemore,* 28 F.3d 1160, 1162 (11th Cir.1994) (citation omitted), it may be

assumed that Congress used the words in the statute as they are commonly and ordinarily

understood, and the Court read the statute to give full effect to each of its provisions. *United*

*States v. DBB, Inc.,* 180 F.3d 1277, 1281 (11th Cir. 1999) (*citing United States v. McLymont,* 45

F.3d 400, 401 (11th Cir.1995) (per curiam)).

The standard for compliance is clearly articulated within the plain meaning of § 2469a.

The Defense Authorization Act of 1998 specifically permits the issuance of a single solicitation

for multiple workloads *only if*:

> (A) the Secretary of Defense determines in writing that the
> individual workloads cannot as logically and economically be
> performed without combination . . . (B) the Secretary submits to
> Congress a report setting forth the determination together with
> reasons for the determination; and (C) the solicitation of offers
> for the contract is issued more than 60 days after the date on
> which the Secretary submits the report.

10 U.S.C. § 2469a(e) (emphasis added).

On December 19, 1997, J.S. Gansler, the Undersecretary of Defense for Acquisition and

Technology reported to Congress the Air Force's decision to bundle the KC-135, A-10, and

various commodities into one solicitation.  AR 001029.  Dr. Gansler reported the decision

followed numerous discussions with Air Force personnel and private industry leaders, leading

the Air Force to conclude performance of a single workload could not be as logically and

economically performed as a combined workload.   In support of the decision, Dr. Gansler

offered the following rationale: significant cost savings, maintenance and operation of combined

facilities that provide the same services to each individual workload, and increased ability to

predict future repair needs of the Air Force. *See* AR 001029-001030. The solicitation was issued

on March 20, 1998, more than 60 days after the Secretarial Determination was reported to

Congress. AR 00148-00690. The court finds therefore, that the Air Force complied with the

requirements set out in § 2469a.

Additionally, Pemco claims the Air Force violated § 2469a(d)(5) of the Defense

Authorization Act of 1998. Pemco Complaint at ¶ 46. Pemco is absolutely correct § 2469a

prohibits preferences for PIP and performance at a single site. Pemco MSJ, 2; 10 U.S.C. §

2469a(d)(5). This correct reading of the law changes neither the analysis nor the outcome of this

court's determination the Air Force did in fact comply with § 2469a. Nowhere in the solicitation

does the Air Force mention a particular location for performance of the contract. Nor does the

agency require the contract be performed in a single location. *See* MDC Opp. at 6 (*citing* Public-

Private Competitions, Review of Air Force Depot Solicitation, GAO-98-48 at 5 (May 1998)

("nothing in the solicitation [] designates a particular location . . . nor do any of the solicitation

evaluation criteria evidence a bias toward any particular location.")); *see also* AR 05699-06263.

Pemco, while conceding the solicitation makes absolutely no reference to any location,

goes to great effort arguing bundling was improper under § 2469a because, despite the fact there

is no reference to location, the Air Force "*really* wanted" PIP. *See* AR 05021. Regardless,

Pemco supports their assumption by pointing out Lockheed Martin was willing to perform the

contract at Sacramento and Boeing was willing to go to Kelly AFB in San-Antonio.[20] In so

doing, Pemco ignores the rather obvious fact the Air Force did not know who would be bidding

on the contract when the decision to bundle was made, making it very difficult for the Air Force

---

[20] Kelly was the other base set for closure under BRAC in 1995.

21

to know where the then unknown bidders would perform the work. Moreover, up to the day before the RFP's were due, it was not clear whether Lockheed would perform the contract in Sacramento or at home in Greenville, S.C.. *See* AR 05062. However, even assuming arguendo the court found evidence the Air Force "*really* wanted" the workload to be performed by private industry on McClellan AFB, the court pauses now to remind Pemco that it is the Air Force's *actions* that must be in conformance with the law, not its suppressed *wishes or desires*.[21]

Moreover, following the Air Force's decision as set forth in the Secretarial Determination, the GAO issued a series of reports to Congress, the last of which states "the solicitation is in compliance with . . . the provisions of 10 U.S.C. § 2469a." GAO Rep. B-279879 (May 4, 1998). Indeed, it is not clear whether Pemco themselves cede compliance with § 2469a.[22]

Pemco next argues the Air Force violated the "spirit" of § 2469a, alleging the statute is to be construed as imposing a standard of detail within the Secretarial Determination required for compliance. In the event the statute's language is ambiguous, application according to its plain meaning would lead to an absurd result, or there is clear evidence of contrary legislative intent,

---

[21] Additionally, the court is grateful to Pemco, despite the gross impropriety of quoting the Spice Girls in a submission before this court, for providing humor within their voluminous evidentiary material. *See* AR 005021, Pemco Aeroplex, Inc.'s Comments on the Agency's Report.

[22] It appears from the face of Pemco's Brief in Support of Pemco's Motion for Summary Judgment Pemco argues that, regardless of the Air Force's compliance with § 2469a, § 2469a was not meant to replace CICA and *that* is why the bundling decision is violative of procurement law. In the alternative, briefs in support of Pemco's opposition to both the defendant and intervenor briefs seem to continue to allege violations of § 2469a itself. Based on their position in their own brief in support of their motion for summary judgment and the burden associated with such motion, this Court finds Pemco stipulates § 2469a compliance.

the court will look beyond the plain language of a statute to determine the congressional intent. *United States v. DBB, Inc.,* 180 F.3d at 1281 (*citing Consolidated Bank, N.A. v. Office of Comptroller of Currency,* 118 F.3d 1461, 1463-64 (11th Cir.1997) (citations omitted)). The same holds true where the plain meaning, though not absurd, is 'plainly at variance with the policy of the legislation as a whole.' *American Trucking Ass'n,* 310 U.S. at 543, 60 S. Ct. at 1064.

A statute, however, is not ambiguous merely because the parties disagree on its meaning. *See United States ex. rel. Stinson, Lyons, et al. v. Blue Cross Blue Shield of Georgia, Inc.,* 755 F. Supp. 1040, 1047 (S.D. Ga. 1990) (*citing In re George Rodman, Inc. v. Fort Worth Pipe Co.,* 792 F. 2d 125, 128, n. 8 (10th Cir. 1986)). Indeed, it is only the inescapable ambiguity of a statute that warrants an examination into its legislative history. *Solis-Ramirez v. United States Department of Justice,* 758 F.2d 1426, 1430 (11th Cir. 1985); *see also Garcia v. United States,* 469 U.S. 70, 75, 105 S.Ct. 479, 482 (1984) (cautioning situations regarding an examination of legislative history are rare)). A statute rises to the level of inescapable ambiguity only where there exists such an extraordinary showing of contrary intentions that an alteration of the plain meaning is warranted. *Garcia,* 469 U.S. at 75.

In the instant statute, the court finds no such ambiguity. As noted above, the statute permits bundling in limited circumstances and only after strict compliance with the notification procedures. There is no mention nor inference of a legal standard. In fact, the only other case interpreting § 2469a specifically held there was no legal standard "setting forth the level of detail required in the [agency's] report to Congress." *National Airmotive Corporation v. Cohen,* 1999 WL 102035 *3 (N.D. Cal. 1999).

23

Even if ambiguity existed, thereby warranting an examination of the legislative history, the legislative history itself supports the courts holding. It is clear § 2469a was enacted as a measure to ensure competitiveness in the procurements arising out of the base closures at McClellan and Kelly Air Force Bases. Senate Report No. 105-29 (June 18, 1997). Specifically, Congress was concerned the President's commitment to PIP would undermine the very purpose of BRAC. *Id.* The Conference Report makes clear bundling would be authorized where the Secretary of Defense determined individual workloads could not be performed separately as logically and economically as combined workloads. 1997 U.S. Code Cong. and Admin. News 2251, 2503. The requirement of a Secretarial Determination was motivated by the conferees' concern that bundling would disadvantage bidders who were qualified to perform an individual workload but could not adequately perform all of the workloads combined. *Id.* The interpretation of § 2469a(e) is in accord with this concern.

In viewing the statute as a whole and in light of the legislative history, it is apparent the statute in its entirety was intended as a procedural framework designed to ensure competition. The statute specifically provides for the performance of the contract at multiple locations as well as allowing for teaming with other private or public entities to perform the workload. Additionally, the statute sets out factors that must be taken into consideration when comparing the offers received under the solicitation. It is the cumulative effect of the statute, not one isolated provision, that operates to ensure competition. It would be counterintuitive to enact an entire statute setting forth a competitive framework, the success of which hinges on a determination of the Secretary of Defense.

Based on the foregoing reasons, this Court finds the Air Force complied with 10 U.S.C. § 2469a as a matter of law.

## B. CICA

Pemco claims that combining the KC-135 workload with the A-10 and commodities workload was not authorized by law and was not necessary to satisfy Air Force's needs. Pemco Complaint ¶ 70, 75. However, the Department of Defense has shown, and Pemco seems to agree, that combining the workloads was authorized by 10 U.S.C. § 2469a. Therefore, in order for Pemco to prevail, it must show the decision to bundle was not necessary to meet the Air Force needs or that § 2469a was not intended to fall under the exception to the prohibition of restrictions under § 2305(a)(1)(B)(ii).[23] In determining whether Pemco's interpretation of the CICA is correct, the court is again governed by the familiar canons of statutory interpretation.

### 1. "As authorized by law"

In examining the language of the CICA itself, it may be assumed Congress used the words contained within the statute as they are commonly and ordinarily understood. *See Korman,* 182 F.3d at 1295; *see also DBB,* 180 F.3d at 128. Pemco argues rather than supplant the CICA, § 2469a(e) was intended to impose additional requirements on government procurements. However, § 2305(a)(1)(B)(ii) of the CICA provision seems to rule out this proposition by plainly stating "solicitations shall include specifications which include restrictive provisions or conditions only to the extent necessary to satisfy the needs of the agency *or as authorized by*

---

[23] Statutory cites are directed to the Armed Service Procurement Act which incorporates the CICA by reference.

*law.*[24]  10 U.S.C. § 2305(a)(1)(B)(ii) (emphasis added).

Therefore, for a restrictive provision or condition to be permissible under the CICA, it

must be either "to the extent necessary to satisfy the needs of the agency or authorized by law."

*See* 10 U.S.C. § 2305(a)(1)(B)(ii). Here, § 2469a clearly authorizes a bundled solicitation upon

the issuance of a Secretarial Determination stating bundling is as logical and economical as

individual procurements. *See* 10 U.S.C. § 2469a(E)(1)(A)-(C). Therefore, under the plain

language of the statute, the bundling provision of the SM-ALC solicitation was permissible

under the CICA as it was authorized by 10 U.S.C. § 2469a.

Additionally, the legislative history encompassing the enactment of the CICA supports

this Court's holding. The context in which Congress acted furthers the proposition § 2469a was

intended to supplant rather than support the CICA. At the time of the enactment of § 2469a,

Congress was concerned the "bundling of these workloads could disadvantage bidders that

[were] fully qualified to perform one or more of the individual workloads but can not adequately

perform all of the workloads combined." Through the enactment of § 2469a, Congress intended

insure the closing of Kelly and McClellan Air Force Bases would be done in the most effective

and competitive manner. *See* Senate Report No. 105-29 (June 18, 1997). These concerns mirror

those present in the passage of the CICA. The difference therefore, is that the CICA speaks to

government solicitations in general while § 2469a speaks specifically to solicitation promulgated

by the Kelly and McClellan base closures.

---

[24] In their brief in support of summary judgment, McDonnell Douglas argues the CICA applies solely to specifications and not to solicitations. The court finds their argument unpersuasive and contrary to the overwhelming body of case law supporting the holding that § 2305 applies to solicitations as well.

Indeed, the CICA was enacted as part of the Deficit Reduction Act of 1984 to quell the persistent and costly use of "sole-source" or non-competitive contract awards made by federal agencies, particularly in the defense area. The Act was meant to compel greater use of fair, competitive bidding procedures. *See Ameron v. U.S. Army Corp. of Engineers,* 809 F.2d 979, 984 (3rd Cir. 1986). To insure greater competition, the CICA established a system by which the GAO, or Comptroller General, can investigate protests lodged by frustrated bidders that an agency failed to adhere to the procedures set out in the statute. Upon receipt of the protest, the Comptroller is to notify the agency concerned, investigate the charge, and issue a non-binding recommendation to the agency. *See Lear Siegler, Inc., Energy Products Div. v. Lehman,* 842 F.2d 1102(9th Cir. 1988).

Yet another fundamental principle of statutory construction requires the application of the more specific statute over the more general one. *San Pedro v. United States,* 79 F.3d 1065, 1069 (11th Cir.) *cert. denied,* --- U.S. ----, 117 S.Ct. 431, 136 L.Ed.2d 330 (1996). The fact the two statutes share such a similar scheme and motivation, yet one is of specific application, gives rise to the inference when Congress enacted § 2469a and gave the Air Force its directive regarding the solicitation for the outsourcing of the Kelly and McClellan Air Force Base workloads it did not at the same require compliance with the CICA. Given the level of specificity found in § 2469a, it is clear Congress intended the CICA to be the floor and § 2469a to be the ceiling with regard to the outsourcing of these specific base workloads.

In this context, the court declines Pemco's invitation to hold that when Congress enacted 10 U.S.C. § 2469a, they intended the statute to impose additional requirements on the Armed Forces' solicitations resulting from the closing of Kelly and McClellan Air Force Bases.

27

## 2. "To the extent necessary to meet the needs of the agency"

Assuming arguendo Congress intended § 2469a to support rather than supplant the CICA, the Air Force's decision to bundle the workloads is still compliant with the CICA as the decision was necessary to meet the needs of the agency. *See* 10 U.S.C. § 2305(a)(1)(B)(ii).

From the outset, it should be noted the court has examined both the decision of the GAO in Pemco and the decision of the GAO in the companion protest, National Airmotive Corporation.  In so doing, the court fails to find any material difference in the rationale supporting the Air Force's decision to bundle the either SM-ALC workload or the SA-ALC workload.[25]  The GAO reconciles its decision in Pemco with National Airmotive by pointing to the evidence establishing a *convincing* relationship between the decision to bundle and readiness concerns existing in National Airmotive.  However, this rationale is in conflict with the law.  The standard under which an agency's decision is to be scrutinized is one of substantial evidence.  For purposes of review under Administrative Procedure Act (APA), "substantial evidence" is more than a scintilla but less than a preponderance of the evidence;  it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  5 U.S.C.A. § 706(2)(E).  Absent a record devoid of reasonable evidence, the agency's decision must stand. *See Organized Fishermen of Florida, Inc. v. Franklin,* 846 F. Supp. 1569, 1573

---

[25] The SA-ALC is the air logistics center located on Kelly Air Force Base in San Antonio, Texas.  Like McClellan, Kelly was slated for base closure in 1995 with a closure date set for 2001.  In its decision, the GAO found the following rationale supportive of the Air Force's decision to bundle: current management of the workloads as a single commodity, workloads sharing of common processes utilizing common facilities, equipment and personnel concerns, military readiness risks and the requirement the closure be completed by 2001.  The evidence in support of these factors is substantially similar to the evidence offered by the Air Force in the instant case. *See* GAO Decision; Re: National Airmotive Corp., http://www.gao.gov.

(S.D. Fla. 1994).

Additionally, in reviewing the evidence before it, this court has determined the Air Force's concern with readiness was one that is rational and supported by substantial evidence. The commodities workload performed at SM-ALC is responsible for vital parts of several different aircrafts employed by the Air Force. Included in that workload are the electrical generators and actuators for the F-16 fighter aircraft, control valves for the KC-135, and hydraulic pumps and certain flight control components for the F-15 fighter aircraft. AR 04916. Also included in this workload is landing gear.[26] As stated earlier, problems with any commodity on an aircraft require that aircraft be grounded until it can be repaired. If the designated source of repair is not performing efficiently, the time that the aircraft is unavailable may be extended, affecting the Air Force's ability to perform its missions. Obviously, there is no guarantee an Air Force mission during the time of SM-ALC workload transitioning will not be a matter of national security.

Pemco, despite the fact the Mission Capable Rate is at its lowest rate since the 1980's, has attempted to undermine the Air Force's argument the MCR should be a consideration. In so doing, Pemco has failed to consider the fact the MCR was determined prior to, and absent consideration of, the base closure and accompanying transitional period. It defies logic to ignore the fact the MCR will necessarily decline by mere virtue of the fact the transition period will carry with it significant upheaval in successful and timely performance of all workloads causing the MCR to decline even more. Similarly, it is counterintuitive to assume the MCR would not

---

[26]The court would be hard pressed to find anyone who would not count landing gear among the most important instruments required for successful air flight, regardless of whether the landing gear was attached to aircraft employed by the Air Force or the private sector.

decline further if more than one transition was required.

However, even if the MCR was not in sufficient danger to be a consideration in the Department of Defense's decision to bundle the solicitation, the fact it was considered is not dispositive of whether the decision to bundle was rational. Even where some aspects of the Department of Defense's rationale might appear erroneous when read in isolation, the decision to bundle will be upheld when, considered in its entirety, it is determined to be a decision based on appropriate considerations that otherwise lack arbitrariness and capriciousness. *See American Legion v. Derwinski,* 54 F.3d 789 (D.C. Cir. 1995). Here, the court finds the decision to bundle well supported by the alternative concerns articulated by the Air Force in the Secretarial Determination.

In addition to the readiness concern, the Air Force considered time constraints, cost savings, insufficient competition for individual workloads, and workforce attrition as reasons to bundle the workloads.[27]   Taken as a whole, these considerations more than support the Department of Defense's determination that bundling was necessary to meet the needs of the agency.

The Air Force was under significant time constraints. After the decision to close McClellan was made in 1995, the Air Force investigated the alternative approaches to the transitition of the SM-ALC workload. This investigation was completed shortly before the Secretarial Determination was reported to Congress in December of 1997. By this time, the Air Force had only three years to solicit and transfer *all of* the work performed not only at SM-ALC,

---

[27] These same concerns lead the GAO to decline the National Airmotive Corp. protest of the Kelly Air Force Base bundling decision.

but on McClellan AFB in its entirety. In the event the SM-ALC workloads had to be transitioned separately, it is more than possible the deadline for closure would not be met. Not only would the actual transition of individual workloads take more time, but the events leading up to each separate transition would have an adverse impact on a successful closure. Each workload would be required to undergo acquisition planning, acquisition bidding, award studies and final solicitation, all before the workload could be actually transferred. It is likely these obstacles would exponentially increase the time needed to move the SM-ALC workloads off McClellan. Therefore, the court finds the Air Force's consideration of time constraints rational as closure of McClellan by its congressionally mandated deadline of 2001 was necessary to meet the needs of the agency.

Additionally, the Air Force considered work force attrition in the decision to bundle the workloads. The court finds this consideration to be rational as an experienced and available workforce is necessary to the needs of the Air Force. At the preliminary injunction hearing, Mr. Barrone, testified extensively about the effects base closure has on work force attrition. Barrone Testimony at 133. Specifically, because of the nature of the civil service seniority system, senior employees could chose to stay at SM-ALC until the base is fully closed. AR 05157-05158. Furthermore, military personnel with seniority could request transfers in light of the closure before their assigned workload is outsourced. This personnel reduction would undermine the efficiency and success of workload performance as well as undercut available personnel to manage the transitions themselves.

Finally, the Air Force was concerned with cost savings and adequate competition. Concerns over cost savings took two forms, savings to the government and its taxpayers and

savings to bidder who was awarded the contract. The Air Force believed savings to the government would be generated by a single transition requiring less management, fewer studies, and effective performance of the workloads during the period between the BRAC recommendation and final outsourcing. Additionally, it was thought increased competition would drive the prices submitted by the competitors down, resulting in a cumulatively lower contract price. Savings to the bidder awarded the contract were thought to be generated by more stable workloads resulting in less risk, the use of one common backshop performing multiple tasks, and a constant, ascertainable profit margin found in the KC-135 workload.[28]

Concerns over adequate competition are well documented. The commodities workload involves virtually every major aircraft system currently employed by the Air Force. However, the work required on the commodities is extremely volatile. In fact, a quarter of the workload has no predicted need. *See* GAO Decision B-280397 (September 25, 1998) at 3. Exacerbating the situation is the fact that 80% of the entire commodities workload makes up only 20% of the value of the workload. Clearly, private companies were warranted in their lack of enthusiasm towards the commodities. Taking the commodities alone could put a corporation at financial risk–not knowing what would have to be repaired or the value of that repair to the company, yet being required to maintain a fully equipped facility and personnel to perform the work, should the work arise. Therefore, in order to make the commodities portion of the workload more attractive, the Air Force decided to bundle the more stable A-10 and KC-135 workloads. This decision is a logical one, rationally related to the Air Force's need to have adequate competition

---

[28] The KC-135 workload is determined far in advance, enabling the PDM site to determine how many aircrafts will be maintenance and at what cost.

and performance of the commodities workload.

### 3. "Full and open competition"

Pemco next argues the Air Force violated the CICA requirement of "full and open competition." (Pemco Complaint at ¶ 68). Even if the court assumes arguendo the CICA statute is supplemented rather than replaced by 2469a, the court finds no such violation.

Under the CICA, solicitations made by the Air Force must permit full and open competition and include restrictive provisions only when necessary to meet the needs of the agency or when authorized by law. 10 U.S.C. § 2305(a)(1)(B). "Full and open competition" was defined by the conferees as permitting all responsible sources to submit bids or proposals for a proposed procurement. 10 U.S.C. § 2302(3)(D). Congress saw full and open competition as a way of ensuring that all capable contractors who wanted to do business with the Government would be afforded the opportunity to bid for that business. *See* Senate Report No. 98-50 (June 27, 1984); *see also* 1984 U. S. Code Cong. and Admin. News 697, 2116.

The legislative history of the CICA makes clear Congress was attempting to remedy a system of sole-source procurement through the enactment of the CICA. At issue was the lack of advertisement and negotiation of a solicitation before a procurement award was made. *See* Senate Report 98-50. Therefore, it is reasonable to infer Congress intended the phrase "full and open competition" to mean all responsible sources were aware and permitted to submit proposals for government procurements. By ensuring competition through the notions of fair play, both the public at large and prospective bidders benefitted by the enactment of the CICA. The prospective bidder would now have an enhanced opportunity to bid on previously unavailable procurements and the public would benefit from the cost-savings inherent in competitive

bidding.

There is nothing in the record to suggest the Air Force sought to deter full and open

competition.[29]  In fact, the Air Force specifically encouraged teaming in an effort to ensure all

available sources would be permitted to bid on their particular area of expertise.

Additionally, the solicitation itself was widely advertised, appearing on the World Wide Web,

including RFI's for all prospective offerors, as well as a strategy synopsis published in

*Commerce Business Daily.* AR 00697.  The mere fact *Pemco* made the business decision not to

contract for the workload in its entirety and subsequently acquire, subcontract or team for the

remaining resources needed for successful completion of the entire workload does not give rise

to a violation on the part of the Defendants of the full and open competition requirement of the

CICA.

Having found the Air Force examined the information relevant to the SM-ALC workload

transition, articulated a satisfactory explanation for their decision to bundle, and offered a

rational connection between the facts found and the decision to bundle, this Court finds such

decision to be a rational one, free of arbitrariness and capriciousness.  Therefore, the decision to

bundle the workload as necessary to meet the Air Force's needs shall stand.  Accordingly,

---

[29] Ironically, the bundling decision seemed to enhance competition.  Ogden received bids
from six companies willing to team with the Air Force Base.  Absent the teaming arrangement,
the evidence suggests no companies could financially afford to bid on the commodities.
Additionally, the teaming arguably enhanced competition within the KC-135 workload.  Given
Pemco's financial condition, it is unclear whether they would have had the financial stability
necessary to support the initial stages of such an immense procurement without the assistance of
other, more financially viable companies.  *See* DCAA Audit Report of Pemco Aeroplex, AR
04608-04807 (referring to Pemco as "financially unstable"); *see also* Deposition of Matthew
Gold, President and CEO of PSI, Inc., April 1, 1999 at 74-75; Deposition of Raymond Hauck,
April 9, 1999 at 172-73 (acknowledging the increased KC-135 workload the preceding year
financially strained the company's cash resources).

Pemco's motion for summary judgment is **DENIED** and Defendants' and Defendant-Intervenor's motion for summary judgment is **GRANTED**.

## C. Injunctive Relief

To be entitled to injunctive relief, Pemco initially must demonstrate to the court that the exercise of equity jurisdiction is proper. To carry this burden, Pemco must show that there is no adequate legal remedy, the threatened injury is real, not imagined and that no equitable defenses exist. *See Clark Construction Co. v. Pena,* 930 F. Supp. 1470, 1477 (M.D. Ala 1996).

The court recognizes money damages in a government procurement challenge are not always an "adequate legal remedy." *See M. Steinhal,* 455 F.2d at 1302. Indeed, in certain cases challenging government contracts, equitable relief may be the only relief adequate to address the damages incurred by the disappointed bidder at the same time insuring the integrity of the government procurement process. *See Clark Construction Co.,* 930 F. Supp. at 1478 (*citing Chemung County v. Dole,* 781 F. 2d 963, 969 (2nd Cir. 1987) (citations omitted). However, the court is not without discretion in determining the propriety of exercising its equitable powers. Under the doctrines of public interest, the court is entitled to withhold equitable relief even where the disappointed bidder cannot be made completely whole in damages. *See M. Steinhal,* 455 F.2d at 1302.

In analyzing the public interest at stake, the court is instructed to "give due regard to interests of national defense and national security." *See* 10 U.S.C. § 1491(a)(3). While assertions of national defense should be evaluated with the same analytical rigor as other allegations of potential harms to the public or the parties, the court should err on the side of caution when

entertaining national defense concerns. *See ATA Defense Industries, Inc. v. United States,* 38

Fed. Cl. 489, 506 (Cl. Ct. 1997) *citing Magnavox Electronic Systems Co. v. United States,* 26 Cl.

Ct. 1373, 1384 (1992)).   In the case at bar, the Air Force articulated viable, well grounded

concerns the impact single solicitations would have on the national defense.   A significant

amount of the Air Force's fleet, as well as several NATO members' planes, are directly affected

by the work performed at McClellan Air Force Base.   The Air Force has shown how single

solicitations would pose additional interruptions in the performance of these workloads and the

effect of such interruption on the Air Force's military readiness.   Therefore, despite the fact

money damages may not make Pemco completely whole, the court finds it prudent, in light of

public interest to withhold equitable relief.

Even if the court were to assume jurisdiction in equity is proper in this situation, Pemco

has failed to show it is entitled to injunctive relief.   Once equitable jurisdiction has been

established, in order to be entitled to injunctive relief Pemco must make the additional showing

of: (1) actual success on the merits (2) a substantial threat of irreparable injury in the absence of

the injunction, (3) that the threatened injury to Pemco outweighs any injuries to the Air Force

caused by the injunction, and (4) that public policy would not be harmed by the injunction. *See*

*Georgia-Pacific Corporation v. Lieberam,* 959 F.2d 901, 909 (11th Cir. 1992); *see also Clark*

*Construction Co.,* 930 F. Supp. at 1477.

The analysis on the merits of injunctive relief in the case at bar begins, and necessarily

ends, with the first requirement, success on the merits of the case.   Pemco has failed to show the

Air Force's decision to bundle the workloads was arbitrary and capricious.   Accordingly, the

government procurement was legal.   Therefore, Pemco has failed to succeed on the merits of

their claim, rendering injunctive relief improper. Accordingly, Pemco's request for injunctive relief is **DENIED**.

## IV. CONCLUSION

In consideration of all of the foregoing, the court is of the opinion that Defendants' and Defendant-Intervenor's motion is due to be granted.

It is therefore **ORDERED** by the court that Defendants' motions for summary judgment on all counts be and hereby are **GRANTED**. Summary judgment is further **GRANTED** in favor of the Defendant-Intervenor and against the plaintiff. Accordingly, the court does hereby **DENY** Plaintiff Pemco's motion for summary judgment on all counts. All parties are to bear their own costs.

**DONE** and **ORDERED** this the _____5_____ day of October, 1999.

_____
INGE P. JOHNSON
UNITED STATES DISTRICT JUDGE

37